**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-4349**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEPHEN DOMINICK MCFADDEN, a/k/a Stephen Domin McFadden,

Defendant - Appellant.

_____

On Remand from the Supreme Court of the United States.
(S. Ct. No. 14-378)

_____

Argued: March 22, 2016             Decided: May 19, 2016

_____

Before TRAXLER, Chief Judge, and WILKINSON and KEENAN, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Traxler and Judge Wilkinson joined.

_____

**ARGUED**: J. Lloyd Snook, III, SNOOK & HAUGHEY, P.C., Charlottesville, Virginia, for Appellant. Anthony Paul Giorno, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee. **ON BRIEF**: Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, Ronald M. Huber, Assistant United States Attorney, Jean B. Hudson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

_____

BARBARA MILANO KEENAN, Circuit Judge:

In this case, which is before us for a second time, we consider whether certain erroneous jury instructions given at trial require us to vacate Stephen D. McFadden's convictions. After a jury trial, McFadden was convicted of conspiring to distribute controlled substance analogues and of distributing controlled substance analogues in violation of the Controlled Substance Analogue Enforcement Act of 1986 (the Analogue Act), 21 U.S.C. §§ 802(32)(A), 813, and the Controlled Substances Act (CSA), 21 U.S.C. §§ 841(a), 846. In McFadden's initial appeal, we affirmed the district court's judgment, and McFadden petitioned the Supreme Court for certiorari. The Supreme Court granted certiorari, concluded that the jury instructions given at trial improperly omitted elements relating to McFadden's state of mind, and remanded this case for us to consider whether the error was harmless.

On remand, we conclude that the erroneous jury instructions constituted harmless error with respect to McFadden's convictions under Counts One, Five, Six, Seven, Eight, and Nine of the superseding indictment. However, we conclude that the error was not harmless with respect to McFadden's convictions under Counts Two, Three, and Four. We therefore affirm in part, vacate in part, and remand the case for further proceedings in the district court.

2

I.

A.

We begin by providing an overview of the relevant federal statutes and regulations governing controlled substances and their analogues. The CSA prohibits the distribution of a "controlled substance," 21 U.S.C. § 841, and defines "controlled substance" to mean any drug or substance included in five schedules, Schedule I through Schedule V, established by the CSA. 21 U.S.C. §§ 802(6), 812(a). Distribution of controlled substances listed on Schedule I carries strict criminal penalties. 21 U.S.C. § 841(b)(1)(C). The Attorney General also has the authority to add substances to or remove substances from the CSA schedules by rule. 21 U.S.C. § 811(a). The up-to-date schedules are codified in the Code of Federal Regulations. See 21 C.F.R. §§ 1308.11–1308.15.

Congress enacted the Analogue Act to prevent the distribution of newly created drugs, not yet listed on the schedules but that have similar effects on the human body. See United States v. Klecker, 348 F.3d 69, 70 (4th Cir. 2003). The Analogue Act defines a "controlled substance analogue" as any substance "the chemical structure of which is substantially similar to [that] of a controlled substance in schedule I or II" (the chemical structure element), and "which has [an actual, claimed, or intended] stimulant, depressant, or hallucinogenic

3

effect on the central nervous system that is substantially similar to or greater than [that] of a controlled substance in schedule I or II" (the physiological effect element). 21 U.S.C. § 802(32)(A).

Under the Analogue Act, controlled substance analogues are treated as Schedule I controlled substances for purposes of federal law. 21 U.S.C. § 813. The interaction between the CSA and the Analogue Act therefore prohibits the distribution of controlled substance analogues, even if not listed on the CSA schedules.

### B.

The facts of this case are discussed in detail in our previous opinion in United States v. McFadden, 753 F.3d 432 (4th Cir. 2014), and in the Supreme Court's opinion in McFadden v. United States, 135 S. Ct. 2298 (2015). We will recite here the facts relevant to the issue presented on remand.

In July 2011, certain law enforcement officials (police officers) in Charlottesville, Virginia began investigating the distribution of synthetic stimulants commonly known as "bath salts." The investigation revealed that bath salts were being sold from a video rental store owned and operated by Lois McDaniel. Under supervision of the police officers, a confidential informant made two controlled purchases of bath salts at McDaniel's video store. On August 24, 2011, the police

4

officers confronted McDaniel with evidence from their investigation, searched the video store, and solicited information regarding her supplier.

McDaniel agreed to cooperate with the investigation and to assist the police in gathering evidence against her supplier, Stephen McFadden. At the officers' direction, McDaniel initiated recorded telephone conversations with McFadden, who was located in Staten Island, New York. The first of these telephone conversations occurred on August 25, 2011. In these recorded conversations, McFadden described the active ingredients in the bath salts and gave instructions on how the bath salts were to be consumed. McFadden also described the stimulant effects of the bath salts and compared the effects to those of cocaine or methamphetamine. During these telephone conversations, McDaniel engaged in five separate controlled purchases of several varieties of bath salts from McFadden. McFadden shipped packages containing bath salts through FedEx, a commercial courier, from Staten Island to Charlottesville.

The United States Drug Enforcement Administration (DEA) seized the packages directly from FedEx. Inside these packages, the "vials" and "baggies" containing the bath salts had been labeled by McFadden, and some labels warned that the contents were "not for human consumption or illegal use." Other labels listed chemical compounds, some of which were Schedule I

5

controlled substances, and stated that the package contents "[did] not contain [those] compounds or analogues of [those] compounds."

Chemical analysis revealed that the composition of the bath salts seized in these shipments changed over time. McFadden's five shipments from July 2011 through September 2011 contained 3,4-methylenedioxypyrovalerone (MDPV), 3,4-methylenedioxymethcathinone (methylone, or MDMC), and 4-methyl-N-ethylcathinone (4-MEC).

On October 21, 2011, the government adopted a rule adding MDPV and methylone to Schedule I. See Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cathinones into Schedule I, 76 Fed. Reg. 65,371, 65,371–75 (Oct. 21, 2011). Immediately upon learning of the new rule, McFadden destroyed his inventory of MDPV and methylone. Although McFadden ceased distributing MDPV or methylone at this point, he continued to send shipments containing 4-MEC until his arrest in February 2012.

A federal grand jury indicted McFadden for distributing MDPV, methylone, and 4-MEC in violation of the CSA and the Analogue Act. The indictment alleged that although MDPV, methylone, and 4-MEC were not controlled substances at the time of McFadden's distribution, these three compounds nonetheless qualified as controlled substance analogues by virtue of their

6

chemical structures and physiological effects.  See 21 U.S.C. § 802(32)(A).  The grand jury charged McFadden with one count of conspiracy to distribute controlled substance analogues between June 2011 and February 2012 (Count One), and eight counts of distribution of controlled substance analogues.  Three counts of distribution corresponded with three different shipments made on July 25, 2011 (Count Two), August 11, 2011 (Count Three), and August 24, 2011 (Count Four), before police officers began supervising telephone conversations between McFadden and McDaniel on August 25, 2011.  Five counts of distribution corresponded with five different shipments made on August 26, 2011 (Count Five), September 16, 2011 (Count Six), October 27, 2011 (Count Seven), January 6, 2012 (Count Eight), and February 2, 2012 (Count Nine), after the police officers began directing and monitoring McDaniel's communications with McFadden.

In a motion to dismiss the indictment and in his proposed jury instructions, McFadden argued that the government was required to prove that he knew the substances he distributed were controlled substance analogues under the Analogue Act. Under McFadden's proposed jury instruction, the government would have been required to prove that McFadden knew that the analogues had substantially similar chemical structures and physiological effects as those of controlled substances.

7

The district court denied McFadden's motion, relying on this Court's opinion in United States v. Klecker, 348 F.3d 69, 71 (4th Cir. 2003) (requiring the government to prove only that a substance had the chemical structure and physiological effects of an analogue and that the defendant intended the substance be consumed by humans). During the four-day trial, McFadden presented evidence that he was not aware of the Analogue Act, or that the CSA prohibited the distribution of controlled substance analogues. The district court instructed the jury consistent with the holding in Klecker, and the jury returned a guilty verdict on all nine counts.

At his sentencing hearing, McFadden argued that he had been careful not to sell any substances listed on the controlled substance schedules. McFadden and the government stipulated that McFadden had consulted the DEA website for the list of controlled substances, and that the website did not contain any warning at the time that controlled substance analogues also were regulated. Further, McFadden testified that he had ceased selling MDPV and methylone after those substances were added to the CSA schedules, even when an undercover DEA agent attempted to purchase them. The district court considered this testimony and sentenced McFadden to serve a term of 33 months' imprisonment on each count, to run concurrently.

McFadden appealed, arguing in this Court that the government should have been required to prove his knowledge of the bath salts' illegal status as a controlled substance analogue. Relying on our precedent in Klecker, 348 F.3d at 72, we affirmed the district court's interpretation of the Analogue Act as not requiring proof that the defendant knew that the distributed substances were controlled substance analogues. See United States v. McFadden, 753 F.3d 432, 436, 443–44 (4th Cir. 2014).[1]

McFadden sought review of our decision by the Supreme Court, which granted certiorari on the issue whether the government was required to prove that he knew that the substances he distributed were controlled substance analogues. The Supreme Court held that a conviction under the Analogue Act requires proof of knowledge of either the substance's legal status as a controlled substance or of its specific features that make the substance a controlled substance analogue. McFadden v. United States, 135 S. Ct. 2298, 2305 (2015). Accordingly, the Supreme Court vacated this Court's opinion, and remanded the case to us to determine whether the district

---

[1] In the initial appeal, we also rejected McFadden's challenges to the vagueness of the Analogue Act, the district court's evidentiary rulings, and the sufficiency of the evidence at trial. See United States v. McFadden, 753 F.3d 432, 436 (4th Cir. 2014). McFadden did not seek Supreme Court review on these other issues, so they are not before us on remand.

9

court's erroneous jury instructions constituted harmless error. Id. at 2307.

## II.

## A.

The Supreme Court has clarified the elements that the government must prove to support a conviction for distribution of controlled substance analogues. As discussed above, the Analogue Act defines a "controlled substance analogue" by its chemical structure and its actual, claimed, or intended physiological effects. 21 U.S.C. § 802(32)(A). If intended for human consumption, any controlled substance analogue is regulated as a Schedule I controlled substance. Id. § 813. Therefore, the CSA's prohibition of knowing or intentional distribution of controlled substances extends to controlled substance analogues intended for human consumption. See id. §§ 813, 841(a)(1).

The government must also satisfy one of two methods of proof regarding the defendant's state of mind. McFadden, 135 S. Ct. at 2305. Under the first method of proof, the government may establish that "a defendant knew that the substance . . . is some controlled substance—that is, one actually listed on the . . . schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the

10

substance." Id. Under the second method, the government may establish that "the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue." Id. Under this second method of proof, knowledge of the substance's chemical structure and physiological effects is sufficient to support a conviction. Id.

A conviction under the Analogue Act therefore requires the government to prove that the defendant: (1) distributed a substance that had the chemical structure of an analogue and the actual, intended, or claimed physiological effects of an analogue; (2) intended that the substance be used for human consumption; and (3) knew either the legal status of the substance, or the chemical structure and physiological effects of that substance. Only the third element is in dispute on remand in this case.

At trial, the jury found that McFadden distributed substances that qualified as controlled substance analogues, and that he intended the substances for human consumption. The district court instructed the jury that to convict on the distribution counts, the jury must find:

> FIRST: That the defendant knowingly and intentionally distributed a mixture or substance that has an actual, intended, or claimed stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the

11

central nervous system of a controlled substance in Schedule I or II of the Controlled Substances Act;

SECOND: That the chemical structure of the mixture or substances is substantially similar to the chemical structure of a controlled substance in Schedule I or II of the Controlled Substances Act; AND

THIRD: That the defendant intended for the mixture or substance to be consumed by humans.

By returning a guilty verdict on the distribution counts of the superseding indictment, the jury necessarily found that McFadden distributed a substance that had the chemical structure of an analogue and the actual, intended, or claimed physiological effects of an analogue, intending the substance to be consumed by humans. The jury was not instructed to determine whether McFadden had knowledge of the legal classification of the substances as controlled substance analogues or of the substances' chemical structures and physiological effects.

The jury instructions for the conspiracy count were essentially identical with respect to the question of McFadden's knowledge. In order to find McFadden guilty of conspiracy, the jury was required to find that McFadden willingly and knowingly joined an agreement that existed "beginning in or around June 2011, and continuing until February 15, 2012," to accomplish the purpose of distributing substances containing MDPV, methylone, or 4-MEC. Conviction on the conspiracy count also required a jury finding that MDPV, methylone, or 4-MEC have the chemical structures and the actual, intended, or claimed physiological

12

effects of controlled substance analogues. By returning a guilty verdict, the jury therefore necessarily found that McFadden conspired to distribute certain substances, and that those substances had the features of controlled substance analogues. However, the guilty verdict did not necessarily reflect that the jury found that McFadden knew the legal status of those substances or that those substances had the chemical structures and physiological effects of controlled substance analogues.

With respect to all nine counts, therefore, the jury instructions omitted the required element that McFadden knew either that the bath salts were regulated as controlled substances or that the bath salts had the features of controlled substance analogues. Accordingly, we turn to consider whether the failure to instruct the jury on this knowledge element constituted harmless error.

B.

A court commits a constitutional error subject to harmless error analysis when it omits an element of an offense from its jury instructions. Neder v. United States, 527 U.S. 1, 8–9 (1999). To establish harmless error in such a case, the government must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967); United States v.

13

<u>Brown</u>, 202 F.3d 691, 699 (4th Cir. 2000). The reviewing court must "conduct a thorough examination of the record," and if "the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . .[,] it should not find the error harmless." <u>Neder</u>, 527 U.S. at 19; <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 279 (1993) (requiring the reviewing court to ensure that the guilty verdict rendered at trial was "surely unattributable to the error").

Both the Supreme Court and this Court have held that an erroneously omitted jury instruction may be deemed harmless error if the omitted element is supported by overwhelming evidence admitted at trial.[2] See <u>Neder</u>, 527 U.S. at 16, 18; <u>Brown</u>, 202 F.3d at 700-01. In <u>Neder</u>, the jury found that a taxpayer had knowingly filed false statements in a tax return by underreporting his income by $5 million, but did not determine whether the false statement was material to the taxpayer's tax liability. 527 U.S. at 16. The Supreme Court held that the omission of this element from the jury instruction was harmless beyond a reasonable doubt, because the taxpayer had contested

---

[2] The government may also prove harmless error by showing that the jury necessarily found facts that would satisfy the omitted element, such as when the omitted element overlaps with an element in another count of conviction. See <u>Brown</u>, 202 F.3d at 699-700. However, the government does not argue that this type of harmless error applies in this case, because the same element was erroneously omitted in all nine counts.

14

only the classification, but not the calculated amount, of the $5 million, and that any reasonable jury would find that $5 million in unreported income is material to tax liability.  Id.

Additionally, in United States v. Davis, 202 F.3d 212 (4th Cir. 2000), we considered the omission of a jury instruction in a case that would have required the jury to determine whether the defendant fired gunshots into a "dwelling."  Id. at 217.  We held that because overwhelming evidence established that the building in question was a family residence with six occupants, the district court's failure to instruct on the "dwelling" element was harmless beyond a reasonable doubt.  Id.

On the other hand, we have held that evidence of an element omitted from jury instructions will not be deemed overwhelming if the defendant had "genuinely contested" the omitted element with evidence that could have caused "disagreement among the jurors about" the contested element.  See Brown, 202 F.3d at 702.  In Brown, the jury was not instructed that it must find unanimously that the defendant had participated in specific predicate violations before finding that he had participated in a "continuing criminal enterprise."  Id. at 698.  The government had presented evidence of several predicate offenses through witnesses whose credibility had been impeached and whose testimony had been countered by other evidence.  Id. at 701–02. We held that the error was not harmless beyond a reasonable

15

doubt, because the omission of the element from the jury instructions could have allowed the jury to return a guilty verdict without unanimous agreement on which predicate offenses occurred. Id. at 702.

In accord with these decisions, we must examine the record for evidence of McFadden's knowledge regarding either the legal status or the relevant characteristics of the bath salts. See McFadden, 135 S. Ct. at 2305. We consider whether the government has met its burden of showing that overwhelming evidence established McFadden's knowledge on this issue, rendering the failure to instruct the jury on that knowledge element harmless beyond a reasonable doubt.

## III.

The government argues that the evidence at trial established McFadden's knowledge under either method of proof articulated by the Supreme Court. According to the government, the evidence overwhelmingly proved that McFadden knew that the bath salts were regulated as controlled substances, and that the bath salts had chemical structures and physiological effects similar to those of controlled substances.

In response, McFadden asserts that his conduct showed that he thought that his actions were lawful, and argues that he is entitled to a jury determination of his credibility on this

16

issue. Relying on the Seventh Circuit's decision in United States v. Turcotte, 405 F.3d 515, 527 (7th Cir. 2005), he also argues that under proper instructions, the jury would have been permitted, but would not have been required, to infer from the evidence that he had any knowledge of the chemical structures of the substances that he sold. We disagree with certain parts of both parties' arguments.

A.

We address the parties' arguments in the context of the two methods of proof identified by the Supreme Court for establishing the knowledge element. The government argues that the first method of proof was satisfied in this case, because overwhelming evidence established that McFadden knew that the bath salts were regulated or controlled under the CSA or the Analogue Act. The government highlights the fact that McFadden distributed the bath salts using packaging, prices, and names consistent with illicit drug distribution. Further, in the recorded telephone conversations, McFadden compared his products to cocaine and methamphetamine. The government also argues that McFadden's attempts to conceal his activity and the nature of his business showed that he was conscious of his own wrongdoing. We disagree with the government's argument regarding the extent of evidence supporting this first method of proof.

17

Although the jury could have inferred from McFadden's evasive behavior and the "disclaimer" labeling of the packages and vials that he knew that the bath salts were treated as controlled substances, McFadden, 135 S. Ct. at 2304 n.1, we agree with McFadden that such an inference would not have been compelled. McFadden countered the government's evidence of his guilty knowledge by presenting evidence that he tried to comply with the law and intentionally avoided selling substances listed on the CSA schedules. McFadden affixed labels to his packages that disclaimed the inclusion of specific Schedule I substances, and he ceased selling MDPV and methylone immediately after learning of their listing in the CSA schedules. Thus, we conclude that McFadden's efforts to avoid selling substances listed in the CSA schedules is the type of "genuinely contested" evidence we discussed in Brown that could have caused "disagreement among the jurors" about whether McFadden knew that the bath salts were regulated or controlled under the CSA or the Analogue Act. See Brown, 202 F.3d at 702.

We therefore hold that the evidence was sufficient to permit, but not so overwhelming to compel, the jury to find that McFadden knew that federal law regulated the bath salts as controlled substances. Instead, the jury could have concluded from the evidence that McFadden erroneously thought that it was not a crime to sell MDPV, methylone, and 4-MEC. Therefore, the

18

government has not shown that overwhelming evidence established McFadden's knowledge under the first method of proof.

                                B.

The government may also prove McFadden's knowledge by showing that McFadden knew "the specific analogue he was dealing with." McFadden, 135 S. Ct. at 2305. For this second method of proof, the government relies on McFadden's statements in telephone conversations recorded between August 25, 2011 and February 1, 2012 to show that McFadden had knowledge of the analogues' chemical structures and physiological effects.

As we discuss below, we agree with the government that the recorded telephone conversations overwhelmingly establish that McFadden knew the bath salts' chemical structures and physiological effects. However, the first recorded telephone conversation occurred on August 25, 2011, after McFadden's conduct giving rise to Count Two (July 11–25, 2011), Count Three (July 29–August 11, 2011), and Count Four (August 10–24, 2011) of the superseding indictment. The government does not cite, nor were we able to find, any earlier direct evidence of McFadden's state of mind.

Although the jury reasonably could have inferred from McFadden's discussions in the August 25, 2011 phone call that he had possessed the required knowledge before his first shipment to Charlottesville, the evidence on this point cannot in any

19

view be termed "overwhelming."  See Brown, 202 F.3d at 701–02. McFadden's brother, a federal law enforcement agent, testified at trial that McFadden began selling "aromatherapy" products after seeing similar products for sale in plain view around Staten Island.  Based on this and the other evidence before us, the jury reasonably could have concluded that McFadden began selling his products before knowing their identity, chemical structures, or physiological effects when ingested.  The jury therefore reasonably could have concluded from the evidence that McFadden's guilty knowledge had not been established at the time he made the shipments corresponding with Counts Two, Three, and Four.  Accordingly, we conclude that the government has not met its burden of establishing harmless error with respect to Counts Two, Three, and Four.

Any reasonable uncertainty about McFadden's knowledge, however, evaporated with McFadden's recorded participation in telephone conversations that demonstrated his full knowledge of the chemical structures and physiological effects of his products.  McFadden does not dispute the accuracy of the recordings and transcripts admitted at trial, nor does he point to evidence that would contradict the contents of those

20

conversations.[3]  In the first recorded substantive conversation, on August 25, 2011, McFadden discussed the composition of his products, characterizing a mixture called "Alpha" as "the straight chemical" and "the replacement for the MDPV."  When asked for further details about a mixture labeled "No Speed Limit," McFadden represented that "Alpha mixed with the 4-MEC gives you a No Speed Limit-like feeling, just not as intense." McFadden also explicitly compared these mixtures to "cocaine" and "crystal meth."  In later conversations, McFadden discussed distributing a "4-MEC" blend called "New Sheens," adding "a little extra kick" to a blend called "Hardball," and describing "Hardball" as a blend with "five active chemicals in it" or "five ingredients."

McFadden nevertheless argues that his statements to McDaniel were mere "sales talk," completely unconnected with any actual knowledge he might have.  McFadden, a construction foreman and furniture salesman, asserts that he obviously lacked the experience or training to have scientific, chemical, or pharmacological knowledge about the products he sold.  We are

---

[3] In his initial appeal, McFadden challenged the relevance of the recordings and the transcripts, but did not challenge their accuracy.  United States v. McFadden, 753 F.3d 432, 443 (4th Cir. 2014).  We held that the district court did not abuse its discretion in admitting the recordings and transcripts, because they were relevant to prove that McFadden intended the bath salts to be used for human consumption.  Id.

not persuaded by this argument, or by McFadden's assertion that under the holding of United States v. Turcotte, 405 F.3d 515, 527 (7th Cir. 2005), he is entitled to have the jury judge his credibility on the knowledge issue rather than have this question be reviewed on appeal for harmless error.

McFadden correctly states the principle from Turcotte, that even if a defendant is proved to have had knowledge of an analogue's physiological effects, a jury is permitted, but is not required, to infer that a defendant had knowledge of the analogue's relevant chemical similarities. See 405 F.3d at 527. However, McFadden's argument on this point, as well as his contention that he was engaged in mere "sales talk," grossly understates the evidence of his knowledge of the substances' chemical structures and physiological effects.

The nine recorded telephone conversations, beginning on August 25, 2011, established McFadden's thorough and detailed knowledge of chemicals identified in Count One and Counts Five through Nine, their chemical structures, their effects, and their similarity to other controlled substances. On August 25, 2011, McFadden explicitly referenced "MDPV" and "4-MEC" by name and described blends of different chemicals. Laboratory tests confirmed that McFadden's statements accurately described the chemical composition of his products. In addition, McFadden's evidence that he consulted the CSA schedules on the DEA website,

22

although effective to raise a question whether he knew the bath salts were regulated as controlled substances, demonstrated that he had sufficient knowledge about his products' chemical structures to be able to compare them to the list of chemical names on the CSA schedules. See 21 C.F.R. § 1308.11. Therefore, the record shows far more evidence than the mere knowledge or representation of physiological effects referenced in Turcotte. See 405 F.3d at 527.

The telephone conversations also established that McFadden knew the physiological effects of the products. On August 25, 2011, McFadden described the "feeling" caused by different blends, comparing their effects to those of cocaine and methamphetamine. The government presented evidence that McFadden's descriptions accurately reflected the actual physiological effects of the blends. And, even if McFadden's descriptions of the physiological effects were merely "sales talk," the Analogue Act defines analogues to include substances merely represented to have the relevant physiological effects. See 21 U.S.C. § 802(32)(A)(iii).

Therefore, the recorded telephone conversations demonstrate overwhelmingly that by August 25, 2011, McFadden knew the chemical identities and the physiological effects of the substances he was selling. As the Supreme Court has held, "[a] defendant who possesses a substance with knowledge of those

23

features knows all of the facts that make his conduct illegal." McFadden, 135 S. Ct. at 2305. Accordingly, we conclude that because overwhelming evidence established that McFadden knew, as of August 25, 2011, the specific features of the substances he was selling, the district court's omission of the knowledge element from the jury instructions was harmless error with regard to McFadden's convictions under Counts Five through Nine. For the same reason, we affirm McFadden's conviction under Count One for conspiracy to distribute controlled substance analogues, which is supported by overwhelming evidence of his state of mind beginning with the date of those recorded telephone conversations.

With respect to Counts Two, Three, and Four, however, because the erroneous omission of the knowledge element from the jury instructions was not harmless beyond a reasonable doubt, we vacate and remand those counts for further proceedings in the district court consistent with the principles expressed in this opinion. We also remand the convictions on Count One, and Counts Five through Nine, to the district court for resentencing.

IV.

For these reasons, we affirm the district court's judgment of conviction on Counts One, Five, Six, Seven, Eight, and Nine,

24

and vacate the court's sentence on those counts and remand for resentencing.  We vacate the district court's judgment on Counts Two, Three, and Four, and remand those counts for further proceedings in the district court.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED