**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-4472**

_____

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff - Appellee,

　　　v.

MARK WILLIAM BAKER, a/k/a Lightning,

　　　　　　　Defendant - Appellant.

_____

**No. 13-4473**

_____

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff - Appellee,

　　　v.

DAVID CHANNING OILER, a/k/a Gravel Dave,

　　　　　　　Defendant - Appellant.

_____

**No. 13-4474**

_____

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff - Appellee,

　　　v.

BRUCE JAMES LONG, a/k/a Bruce Bruce,

        Defendant - Appellant.

---

**No. 13-4532**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

CARLOS HERNANDEZ,

        Defendant - Appellant.

---

Appeals from the United States District Court for the District of South Carolina, at Columbia. Cameron McGowan Currie, District Judge. (3:12-cr-00430-CMC-2; 3:12-cr-00430-CMC-3; 3:12-cr-00430-CMC-4; 3:12-cr-00430-CMC-13)

---

Argued: December 11, 2014      Decided: February 25, 2015

---

Before AGEE, DIAZ, and FLOYD, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Joshua Snow Kendrick, KENDRICK & LEONARD, P.C., Greenville, South Carolina; William Michael Duncan, AUSTIN & ROGERS, PA, Columbia, South Carolina; Cameron Bruce Littlejohn, Jr., Columbia, South Carolina, for Appellants. Julius Ness Richardson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** John D. Delgado, BLUESTEIN & NICHOLS, LLC, Columbia, South Carolina, for Appellant Baker. William N. Nettles, United States Attorney, James H. May, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2012, a federal grand jury issued a 107-count superseding indictment against twenty individuals affiliated with the Rock Hell City Nomad Chapter of the Hells Angels ("the Chapter"). This consolidated appeal challenges the convictions and sentences of four of those individuals. For the reasons set forth below, we affirm the judgment of the district court.

I.

The Federal Bureau of Investigation participated in a two-year interagency investigation of several motorcycle gangs operating in and around Rock Hill, South Carolina. That investigation revealed the Chapter was a motorcycle gang affiliated with its nationwide counterpart, had a chapter house where local meetings took place, had a hierarchy of leadership and membership, and required its members to pay dues.[1] The investigation revealed that, unlike purely recreational motorcycle clubs, many individuals in the Chapter also engaged in numerous criminal activities.

---

[1] The Chapter's hierarchy included officers, as well as "full patch" members who are senior to "prospects." Chapter members referred to their meetings as "church" and paid "tithe" to the Chapter.

In the spring of 2011, Joe Dillulio began cooperating with the FBI investigation. Dillulio, a convicted felon originally from New York, operated a jewelry store in the Rock Hill area. Based in part on his criminal background, Dillulio gained the trust of the Chapter through its then-president Dan Bifield.[2] Dillulio allowed the FBI to set up surveillance and recording equipment in his store and on his telephone. He then began purchasing narcotics and firearms in controlled buys from individuals affiliated with the Chapter. As part of the firearms purchases, Dillulio represented that he was sending the firearms to compatriots in New York who would use the weapons in drug robberies, then sell the drugs and launder the proceeds back through him and conspirators inside the Chapter.

The superseding indictment charged that the Chapter was a criminal "enterprise" and that its full-patch members, prospects, and associates operated through a pattern of racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68. Individuals charged in the superseding indictment were Chapter officers, as well as full-patch members and prospects, members of another local motorcycle gang (the Southern Gentlemen),

_____

[2] Bifield was also named in the superseding indictment. He later pleaded guilty to the RICO conspiracy charged in Count 1 and is not a party to this appeal.

5

members of the Red Devils (a "support group" for the Hells Angels), and other associates.

Mark Baker was not only a full-patch member of the Chapter, but he assumed the role of president during the relevant period of the charged crimes. David Oiler and Bruce Long were also full-patch members. Baker, Oiler, and Long were tried together along with two other co-conspirators whose cases are not before us. A jury convicted each of them of conspiracy to violate RICO, in violation of 18 U.S.C. § 1962, (Count 2 or "RICO conspiracy"); conspiracy to possess with intent to distribute and distribute five kilograms or more of a mixture and a substance containing cocaine, 50 grams or more of actual methamphetamine, 500 grams or more of a mixture of and substance containing methamphetamine, as well as several prescription medications (oxycodone, hydrocodone, and clonazepam), in violation of 21 U.S.C. §§ 841 and 846, (Count 3 or the "narcotics conspiracy"); and money laundering, in violation of 18 U.S.C. § 1856(a)(3)(B) (Counts 49, 50, and 55, respectively). In addition, Oiler was convicted of seven counts of narcotics distribution, four counts of attempted narcotics distribution, one count of possession of a firearm in furtherance of drug trafficking, and one count of possession of a machine gun and silencer. Long was also convicted of seven counts of narcotics distribution, one count of attempted narcotics distribution, and

one count of transfer of a firearm. While each man raises various challenges to his convictions, none challenges his respective sentence.

Carlos Hernandez was not a member of the Chapter, but was an acquaintance of several members and associates. The superseding indictment named Carlos Hernandez in only one count, as a participant in the Count 3 narcotics conspiracy. He was tried separately and convicted. He does not challenge his conviction; instead, he contends there was reversible procedural error in his sentencing.

Additional details related to each issue raised on appeal are discussed in context below. Baker, Oiler, Long, and Hernandez each noted timely appeals, and the Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.


II.

A.

Baker, Oiler, and Long raise three issues jointly. They allege the district court abused its discretion in refusing to instruct the jury (1) on an entrapment defense and (2) about multiple conspiracies as an alternative to the charged narcotics conspiracy. They also contend the record contains insufficient evidence of a pattern or continuity to support their convictions for participating in a RICO conspiracy.

7

1.

Baker, Oiler, and Long first challenge the district court's refusal to instruct the jury on the defense of entrapment. They argue that they were entitled to the instruction because, contrary to the court's conclusion, the record contains more than a scintilla of evidence that Dillulio induced them to participate in the charged offenses.

"Entrapment is an affirmative defense consisting of 'two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct.'" United States v. McLaurin, 764 F.3d 372, 379 (4th Cir. 2014) (quoting Matthews v. United States, 485 U.S. 58, 63 (1988)). "The district court is the gatekeeper; if the defendant does not produce more than a mere scintilla of evidence of entrapment, the court need not give the instruction." United States v. Hackley, 662 F.3d 671, 681 (4th Cir. 2011) (internal quotation marks omitted). An appellate court reviews de novo a defendant's claim that the jury instructions incorrectly stated the law, which includes a district court's refusal to instruct a jury regarding the defense of entrapment. United States v. Ramos, 462 F.3d 329, 334 (4th Cir. 2006).

In the context of entrapment, "inducement" is a term of art requiring evidence that the Government "overreach[ed] and

8

[engaged in] conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993). "[S]olicitation of the crime alone is not sufficient to grant the instruction, as that is not the kind of conduct that would persuade an otherwise innocent person to commit a crime." Ramos, 462 U.S. at 334 (internal quotation marks omitted). Instead, the evidence must demonstrate "excessive behavior on the part of the government that could be said to be so inducive to a reasonably firm person as likely to displace mens rea." United States v. DeVore, 423 F.2d 1069, 1072 (4th Cir. 1970).

Although they each rely on their individual circumstances to bolster their arguments, Baker, Oiler, and Long collectively point to Dillulio's promises of money as evidence suggesting he crossed the line to unlawfully inducing their criminal behavior. They claim that Dillulio lured them into criminal activity by building a relationship with them and giving them more and more money, all while regaling them with tales of his own financial profit. In addition, they contend that Dillulio shrewdly adopted whatever persona he needed in order to empathize with and gain the trust of his current target. And they contend that once he had "set the financial hook," he introduced larger and larger schemes to fortify each man's participation.

We disagree with Baker, Oiler, and Long. Mentioning the prototypical motivation for crimes of the sort with which they were charged – financial profit – is not on its own sufficient to create a question of whether inducement existed. See United States v. Sanches-Berrios, 424 F.3d 65, 76-77 (1st Cir. 2005) ("The only inducement that the record reflects is the chance to make money — and holding out the prospect of illicit gain is not the sort of government inducement that can pave the way for an entrapment defense."); see also United States v. Spentz, 653 F.3d 815, 818-20 (9th Cir. 2011) (same); United States v. Layeni, 90 F.3d 514, 518 n.2 (7th Cir. 1996) (same); United States v. McKinley, 70 F.3d 1307, 1313-14 (D.C. Cir. 1995) (same). There is no evidence in the record that Dillulio ever engaged in coercive, baiting methods of persuasion that preyed on Baker, Oiler, or Long's particular sympathies or financial vulnerabilities. Contrast United States v. Kessee, 992 F.2d 1001, 1003-04 (9th Cir. 1993) (holding entrapment instruction appropriate where government agent "flashed a roll of hundred dollar bills" and repeatedly pressured defendant to sell drugs in order to earn money for a period of time after the defendant lost both of his jobs and expressed concern to the agent about "where he would get the money for rent and food for his family"). Indeed, there is no evidence that Dillulio was aware

10

of any financial difficulties on the part of Baker, Oiler, or Long.

On this record, we are left with the firm belief that Dillulio "'merely offer[ed] an opportunity to commit the crime[s],'" an act that is not sufficient for a reasonable jury to conclude that he unlawfully induced "the participation of" Baker, Oiler, or Long. Ramos, 462 U.S. at 335 (quoting United States v. Harrison, 37 F.3d 133, 136 (4th Cir. 1994)). Accordingly, the district court did not err in refusing to instruct the jury on entrapment.[3] Matthews, 485 U.S. at 62 (holding that a defendant is only entitled to an entrapment instruction when "there is sufficient evidence from which a reasonable jury could find entrapment").

2.

Baker, Oiler, and Long also assert the district court abused its discretion by refusing to give the jury a multiple-conspiracies instruction pointing out that the evidence might show they participated in different conspiracies as opposed to the single overarching narcotics conspiracy charged in Count 3.

---

[3] The district court only addressed the inducement prong of the offense, and because we agree with its analysis on that issue, we do not address the separate factor of predisposition either.

11

They argue that such an instruction was appropriate because the evidence suggests separate agreements between DiIulio and each of them individually during discrete time frames rather than participation in the charged narcotics conspiracy.

A multiple-conspiracies instruction informs the jury that it must acquit a defendant who has not participated in the conspiracy charged even if there is evidence that he participated in a different, uncharged conspiracy. United States v. Toro, 840 F.2d 1221, 1236 (5th Cir. 1988). The purpose of a multiple-conspiracies instruction is to avoid jury confusion and the risk that it will "imput[e] guilt to [the defendant] as a member of one conspiracy because of the illegal activity of members of [an]other conspiracy." United States v. Roberts, 262 F.3d 286, 294 (4th Cir. 2001). But it is also well-established that conspirators need not know "all of the details of the conspiracy." Hackley, 552 F.3d at 679 (quoting United States v. Goldman, 750 F.2d 1221, 1227 (4th Cir. 1984)). The Government can prove a single conspiracy by direct or circumstantial evidence that a defendant knew its "essential object" by demonstrating a "tacit or mutual understanding" between the defendants and other conspirators even where the connection is slight. Id. For that reason, we have held that such multiple-conspiracy instructions are "not required unless the proof at trial demonstrates that [a defendant was] involved

12

only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." United States v. Squillacote, 221 F.3d 542, 574 (4th Cir. 2000) (internal quotation marks omitted).

We review the district court's decision for abuse of discretion. United States v. Jeffers, 570 F.3d 557, 566 (4th Cir. 2009). The Court will only find that the refusal to give a multiple-conspiracies instruction is reversible error where a defendant "suffers substantial prejudice as a result." United States v. Bartko, 728 F.3d 327, 344 (4th Cir. 2013) (internal quotation marks omitted). "[T]he evidence of multiple conspiracies [must have been] so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." Id.

The district court did not abuse its discretion in refusing a multiple-conspiracies instruction. Baker, Oiler, and Long are correct that since Dilulio was a Government agent during the relevant periods, he cannot serve as the requisite co-conspirator link between members of the conspiracy. See Hackley, 662 F.3d at 679 ("[A] government agent . . . cannot be a co-conspirator."). Their remaining arguments assert that since each of them dealt with Dilulio at different periods of time and because there was little-to-no contact between each of

13

them personally, they cannot have been members of the same conspiracy. By focusing on the lack of personal and temporal overlap between each other, they ignore the broader charged conspiracy and the totality of the record evidence showing connections between the charged conspirators and others.

The conspiracy charged in Count 3 was large, naming fifteen individuals alleged to have participated together, and with others who were not charged, in a narcotics conspiracy spanning five years. To satisfy its burden, the Government did not have to prove that Baker, Oiler, and Long acted in concert with each other, but rather that they participated in the Chapter-centered narcotics conspiracy charged in Count 3. See United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988) (noting that the existence of a single conspiracy depends on "the overlap of key actors, methods, and goals"); see also United States v. Johnson, 54 F.3d 1150, 11154 (4th Cir. 1995). The Government's evidence tied Baker, Oiler, and Long individually to others who were also involved in that same endeavor, demonstrating a single conspiracy to participate in the sale and distribution of narcotics in South Carolina, as well as laundering money from the proceeds of drug sales occurring elsewhere. While the evidence against Baker, Oiler, and Long obviously focused on their individual roles, it also included evidence that they worked with other members and associates of the Chapter to

14

purchase and sell narcotics in and around Rock Hill. In addition, the evidence established that they each agreed with other indicted and unindicted individuals to aid Dillulio in laundering the alleged proceeds of the narcotics Dillulio's New York compatriots sold.

That Baker, Oiler, and Long's specific roles encompassed only one type of narcotic charged in the conspiracy, or spanned a discrete period of time within the five-year period charged, or did not connect with each other and only occasionally had direct coordination with other participants, does not alter the conclusion that the evidence points to the existence of the single charged conspiracy. We have often remarked on the inherent "clandestine and covert" nature of a conspiracy, which often leads to there being only circumstantial evidence of its existence. E.g., United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996); see also Blumenthal v. United States, 332 U.S. 539, 557 (1947) ("Secrecy and concealment are essential features of successful conspiracy."). Moreover, "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). And, once the existence of the conspiracy was proven, each individual

15

defendant's connection to it need only have been "slight" to tie him to that charged conspiracy.  Burgos, 94 F.3d at 861.

Simply put, the evidence of multiple conspiracies is not "so strong" in this case in relation to that of a single conspiracy to suggest that "the jury probably would have acquitted on the [narcotics] conspiracy count had it been given a cautionary multiple-conspiracy instruction."  Cf. Bartko, 728 F.3d at 344.  Accordingly, the district court did not abuse its discretion in refusing to give such an instruction.

3.

Baker, Oiler, and Long next challenge the sufficiency of the evidence to support their convictions for participating in a RICO conspiracy.  Count 2 alleged that beginning from 2008 to the date of the superseding indictment, Baker, Oiler, Long, and eight others conspired with each other and uncharged individuals, as "persons employed by and associated with the Enterprise known as the Hells Angels Rock Hell City Nomad Chapter of the Hells Angels," to violate RICO through a pattern of racketeering activity consisting of multiple violations of the Hobbs Act, money laundering, arson, and narcotics trafficking.  (J.A. 190-91 (citing 18 U.S.C. § 1962(c), (d)).) Baker, Oiler, and Long moved for a judgment of acquittal as to Count 2, arguing that the Government failed to show that the

16

conspiracy entailed a "pattern of racketeering" because the predicate acts the Government relied on were "both unrelated and they don't have the threat of future conduct based on the time period[.]" (J.A. 1579-80.) The district court denied the motions.

We review the district court's denial of this motion de novo, viewing all the evidence and drawing all inferences in favor of the Government. United States v. Penniegraft, 641 F.3d 566, 571 (4th Cir. 2011). We must affirm the verdict so long as a reasonable fact finder could find the essential elements of the offense beyond a reasonable doubt. United States v. Higgs, 353 F.3d 281, 313 (4th Cir. 2003).

Under 18 U.S.C. § 1962(d), it is unlawful to "conspire to violate" RICO. RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A "pattern of racketeering activity," consists of "at least two acts of racketeering activity" occurring within a ten-year period, 18 U.S.C. § 1961(5), that are related and "amount to or pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).

17

The Government initially responds that Baker, Oiler, and Long's challenge fails because "so long as the necessary conspiratorial agreement exists, no pattern of racketeering acts with continuity and relatedness need be proven to sustain a RICO conspiracy conviction." (Resp. Br. 52.) The Government is partially correct. In Salinas v. United States, 522 U.S. 52 (1997), the Supreme Court held that a RICO "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," and that he may do so without personally committing or agreeing to commit the two or more acts of racketeering activity required to establish a "pattern." Id. at 63, 65; see also United States v. Mouzone, 687 F.3d 207, 213 (4th Cir. 2012) (holding that because a RICO conspiracy does not "criminalize mere association with an enterprise," "criminal liability will attach only to the knowing agreement to participate in an endeavor which, if completed would constitute a violation of the substantive statute" (internal quotation marks omitted)).

To establish a RICO conspiracy, the Government need not prove that a "pattern of racketeering activity" actually occurred. It need only prove that the conspirators intended to further an endeavor that would include a "pattern of racketeering activity." Because the intended objective of a "pattern of racketeering activity" has the same definition in

18

either context, there still must be some proof in the conspiracy prosecution that the conspiracy was to commit acts that would satisfy the relatedness and continuity criteria of a "pattern of racketeering activity." The concepts of "relatedness" and "continuity" do not vanish simply because this is a conspiracy rather than a substantive RICO violation. Instead, it is the nature of the Government's burden, and the proof sufficient to meet it, that necessarily differ between a RICO conspiracy and a substantive RICO violation. E.g., United States v. Cianci, 378 F.3d 71, 88 (1st Cir. 2004) ("For purposes of a RICO conspiracy, the sufficiency question[] boils down to whether a jury could have found that the defendants intended to further an endeavor which, if completed, would have satisfied the 'pattern' requirement of RICO." (citing Salinas, and then analyzing under H.J. Inc.)); United States v. Corrado, 227 F.3d 543, 554 (6th Cir. 2000) (same).

The Government has satisfied its burden to establish a conspiracy to engage in a "pattern of racketeering activity." In H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989), the Supreme Court explained that to be "related," predicate acts must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics [as opposed to being] isolated events." Id. at 240 (quoting § 3575(e)).

19

While Baker, Oiler, and Long argue their membership in the Chapter was incidental to any criminal activity, the record belies that assertion. The Government's evidence demonstrated that the Chapter served as a central force in the conspiracy. Its members and associates were the participants. The Chapter received proceeds from the illicit activities. The presidents of the Chapter (first Dan Bifield, later Baker) received kickbacks from Dillulio in order to solicit new participants to the activities, recommend who was trustworthy or could be used for particular roles, and generally to keep other conspirators "in line." In addition, the conspirators used common drug suppliers and other connections to facilitate their own roles.

The record also shows continuity of criminal enterprise. While Baker, Oiler, and Long each participated in the conspiracy for a more limited timeframe, the broader charged conspiracy showed that Chapter members were engaged in ongoing criminal activity that had no inherent end. See id. at 241 (stating that continuity can be shown by either "a closed period of repeated conduct, or . . . past conduct that by its nature projects into the future with a threat of repetition"). Indeed, the record suggests that the instigation of criminal proceedings is what ended the conspiracy. See, e.g., Heinrich v. Waiting Angels Adoption Servs., 668 F.3d 393, 410 (6th Cir. 2012) ("'The lack of a threat of continuity of racketeering activity cannot be

20

asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict.'" (quoting United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991)). This evidence is sufficient to satisfy the Government's burden of showing that Baker, Oiler, and Long conspired to engage in an endeavor that sought to undertake a "pattern" of racketeering activity.

B.

While the above analysis resolves Baker's appeal, Oiler, Long, and Hernandez each raise an additional separate claim of error. Oiler challenges the sufficiency of the evidence to support his conviction for possession of a firearm during a drug trafficking crime. Long raises a sufficiency of the evidence challenge to his conviction for transferring a firearm for use in a crime of violence. Hernandez contends the district court committed procedural error during sentencing by including a 1989 state felony conviction in his criminal history computation and that he is entitled to be resentenced. Each argument is addressed in turn.

1.

Oiler challenges the sufficiency of the evidence to support his conviction on Count 37, that "beginning in or around

February of 2012 up to June 7, 2012, [he] knowingly did carry a firearm during, and in relation to, and did possess the firearm in furtherance of, a drug trafficking crime," in violation of 18 U.S.C. § 924(c). (J.A. 208.) In his oral motion for judgment of acquittal, Oiler argued the evidence was insufficient to support his guilt because the audio recording the Government relied on to show Oiler stating he possessed a gun during a drug deal was muffled and could be interpreted differently. The district court denied the motion.

The Court reviews the district court's denial of a motion for judgment of acquittal de novo. United States v. Hamilton, 699 F.3d 356, 361 (4th Cir. 2012). The Court will uphold the jury's verdict if, "viewing the evidence in the light most favorable to the government, there is substantial evidence in the record to support the verdict." United States v. McFadden, 753 F.3d 432, 444 (4th Cir. 2014). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted).

To support a conviction under § 924(c), the record must contain evidence from which a jury could find beyond a reasonable doubt that the defendant (1) possessed a firearm, and (2) that the possession was "in furtherance of a drug

22

trafficking crime[.]" Jeffers, 570 F.3d at 565. A firearm is possessed "in furtherance of a drug crime," when "the possession of a firearm furthered, advanced, or helped forward a drug trafficking crime." United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002).

The record supports Oiler's conviction. At trial, the Government introduced a recording from a March 1, 2012, conversation between Oiler and Dillulio during which Oiler picked up money from Dillulio in order to purchase narcotics. As Oiler prepares to leave, Dillulio says, "do well nobody's gonna bother you with money [sic]." Oiler responds, "F[---] I've got my gun." (J.A. 1888.) While Oiler challenges what the voices on the recording actually say, that constitutes a factual dispute that the jury was entitled to determine. Viewed in the light most favorable to the Government, the recording is proof that Oiler carried a gun as he went to purchase narcotics for Dillulio.[4] As such, the district court did not err in denying Oiler's motion for judgment of acquittal.

---

[4] Oiler's additional assertion that a single reference to carrying a firearm cannot support his conviction finds no support in the statute or case law. 18 U.S.C. § 924(c) (requiring that a person "possess[] a firearm" "in furtherance of" a drug trafficking crime); see, e.g., United States v. Perry, 560 F.3d 246, 256 (4th Cir. 2009) ("In order to convict [the defendant] of a § 924(c) crime, the government was only required to prove that [he] possessed a firearm in furtherance of a single drug-trafficking offense[.]"). Nor is there merit (Continued)

2.

Long challenges the sufficiency of the evidence to support his conviction on Count 70, that he "knowingly did transfer firearms, that is, a Norinco model SKS 7.62 caliber rifle and a Tanfoglio Titan model .25 caliber pistol, knowing that the firearms would be used in a crime of violence and a drug trafficking crime," in violation of 18 U.S.C. § 924(h).[5] (J.A. 228.) Long does not dispute that on September 28, 2011, he sold the two firearms to Dillulio. Instead, Long argues the record evidence does not prove beyond a reasonable doubt that he "knew" when he transferred the firearms to Dillulio that they would be used to commit a crime of violence.

Because Long did not move for a judgment of acquittal on this count, we review for plain error. See United States v. Wallace, 515 F.3d 327, 332 (4th Cir. 2008) (discussing standard of review for sufficiency of evidence claims that have not been

---

to Oiler's argument that the conviction cannot stand because the district court dismissed a count (Count 36) that was added against him at the same time as Count 37. The dates set out in Count 37 encompass the March 1, 2012, act of possession, and that was the basis for the Government's prosecution of Count 37. We therefore reject these arguments as well.

[5] Eighteen U.S.C. § 924(h) states: "Whoever knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence . . . or [a] drug trafficking crime . . . shall be imprisoned not more than 10 years, fined in accordance with this title, or both."

24

preserved below); see also United States v. Olano, 507 U.S. 725, 732-34 (1993) (stating that to demonstrate plain error, there must be (1) error; (2) that was plain; and (3) that affected the defendant's "substantial rights").  The jury verdict will be upheld if "there is substantial evidence, viewed in the light most favorable to the Government, to support it."  United States v. Cardwell, 433 F.3d 378, 390 (4th Cir. 2009).

Applying these standards, we affirm Long's conviction for violating § 924(h).  At trial, the Government introduced recordings in which Dillulio and Long discussed Dillulio's plan to have his New York "crew" rob a "Mexican . . . with like four pounds of meth," then sell it in Canada and give the proceeds to Dillulio to be laundered locally.  (J.A. 1728, 1733.)  A conversation between Dillulio and Dan Bifield recorded around this same time featured Bifield telling Dillulio that Long could obtain an AK47 for him.  A later conversation between Dillulio and Long confirms that Bifield had relayed this information to Long, and that Long needed to check what he could supply.  A few days later, Long told Dillulio that he could provide a firearm "similar" to the AK47.  (J.A. 435.)  During that conversation, Long also mentioned "find[ing] out who's got some [drugs] and knock[ing] them off," and Dillulio again mentioned the New York robbery to obtain narcotics for resale.  (J.A. 436.)  Lastly, during the firearms transfer, Dillulio asked how the rifle

25

works, and Long replied that "whoever is going to get it, they'll know what to do." (J.A. 1221.) This record is sufficient for a jury to have concluded that Long "knew" from both Bifield and Dillulio directly that the firearm would be used "in a crime of violence or a drug trafficking crime." We therefore affirm this conviction.

3.

Hernandez was charged and convicted of participating in the narcotics conspiracy (Count 3). The pre-sentence report included three criminal history points for a 1989 South Carolina conviction for criminal sexual conduct, third degree ("1989 state felony conviction"). Consequently, it set Hernandez's criminal history category at IV, which, when coupled with his total offense level of 36, resulted in a Sentencing Guidelines range of 262 to 327 months' imprisonment.

Over Hernandez's objection to the criminal history computation, the district court adopted all of the PSR's recommendations and sentenced Hernandez to the low end of the calculated Sentencing Guidelines range, 262 months' imprisonment.

Hernandez argues, as he did below, that his 1989 state felony conviction falls outside the 15-year look-back period for when prior offenses can be included in computing a criminal

26

history category.[6] He contends that his term of imprisonment for the 1989 state felony conviction ended on December 31, 1996; that the 15-year look-back period thus expired on December 31, 2011; and that there was no evidence in the record that his participation in the narcotics conspiracy began prior to January 2012. Accordingly, he argues that his 1989 state felony conviction should not have been included as part of his criminal history computation.

The Government bore the burden of proving the facts necessary to establish the applicability of any Guidelines enhancements by a preponderance of the evidence. United States v. McGee, 736 F.3d 263, 271 (4th Cir. 2013). We review the district court's factual findings for clear error, and its legal conclusions de novo. Id. We will reverse under the clear error standard only if we are "'left with the definite and firm conviction that a mistake has been committed.'" United States

---

[6] U.S.S.G. § 4A1.2 instructs how a defendant's criminal history is to be computed. Subsection (e)(1) states:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

v. Stevenson, 396 F.3d 538, 542 (4th Cir. 2005) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)).

Because the record contains ample evidence to support the district court's finding that Hernandez participated in the narcotics conspiracy in December 2011, we hold that it did not err by including Hernandez's 1989 state felony conviction as part of his criminal history computation. That evidence consisted of both telephone toll records and recordings from wiretapped telephone conversations and in-person conversations. Although there are not recordings of Hernandez talking to any co-conspirators during December 2011, the Government's evidence nonetheless proved by a preponderance of the evidence that Hernandez was participating in the conspiracy during that month.

At trial, the Government introduced evidence that Dillulio would purchase narcotics from co-conspirator Oiler, whose supplier was co-conspirator Kerry Chitwood,[7] whose supplier was Hernandez. In December 2011, the FBI only had recordings of the telephone and in-person conversations between Dillulio and Oiler because they had not yet obtained wiretap warrants for Oiler and Chitwood's telephones. In January 2012, the FBI obtained permission to wiretap Oiler's telephone, and in February 2012,

---

[7] Chitwood was also named in the superseding indictment; he pleaded guilty to the narcotics conspiracy charged in Count 3 and is not a party to this appeal.

28

they wiretapped Chitwood's telephone. Based on when the Government began obtaining this evidence, then, it introduced recordings of conversations between Oiler and Dilluio that occurred in December 2011, recordings of conversations between Chitwood and Oiler (and between Oiler and Dillulio) that occurred in January 2012, and recordings of conversations between Hernandez and Chitwood (and between Chitwood and Oiler, and Oiler and Dillulio) in February and March 2012. Because it lacked audio recordings of conversations between Hernandez and Chitwood before February 2012, the Government introduced toll records from December 2011 through February 2012 showing telephone calls placed to and from the numbers identified as belonging to Oiler, Chitwood, and Hernandez.

Cross-referencing this data demonstrates that the pattern established by a "complete" set of recordings arranging the deals in February and March 2012 is consistent with a pattern also indicated by the combination of "incomplete" recordings and telephone toll records for similar deals in January 2012 and — fatal to Hernandez's claim on appeal — December 2011. Thus, while Hernandez was not recorded on a wiretap in December 2011, the evidence nonetheless demonstrated, by a preponderance of the evidence, a pattern of telephone communications from each lower-level conspirator to Hernandez in December 2011.

29

In sum, then, the district court did not clearly err in determining that the Government established by a preponderance of the evidence that in December 2011, Hernandez was supplying narcotics to Chitwood, on behalf of Oiler, to be sold to Dillulio. Because the evidence connected Hernandez to the narcotics conspiracy in December 2011, he was serving a term of imprisonment for his 1989 state felony conviction during the 15-year look-back period set out in U.S.S.G. § 4A1.2(e)(1). Accordingly, the district court did not err by including points for the 1989 state felony conviction in Hernandez's criminal history computation.

III.

For the reasons set forth above, we affirm the judgments of conviction and sentences of Baker, Oiler, Long, and Hernandez.

AFFIRMED

30