**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4727**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BENJAMIN GALECKI,

Defendant – Appellant.

**No. 18-4730**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHARLES BURTON RITCHIE,

Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Newport News.  Raymond A. Jackson, District Judge.  (4:15-cr-00018-RAJ-LRL-1; 4:15-cr-00018-RAJ-LRL-2)

Argued: March 19, 2019                                   Decided: July 29, 2019

———————

Before AGEE and FLOYD, Circuit Judges, and DUNCAN, Senior Circuit Judge.

———————

Affirmed in part, reversed in part, vacated, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Floyd and Senior Judge Duncan joined.

———————

**ARGUED:** J. Lloyd Snook, III, SNOOK & HAUGHEY, P.C., Charlottesville, Virginia, for Appellants. Eric Matthew Hurt, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee. **ON BRIEF:** Christian L. Connell, Norfolk, Virginia, for Appellant Benjamin Galecki. G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, Kevin Hudson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

———————

AGEE, Circuit Judge:

A federal jury convicted Benjamin Galecki and Charles Burton Ritchie ("Defendants") of charges related to a conspiracy to distribute controlled substance analogues. Defendants then appealed to this Court for the first time, challenging several of the trial court's rulings, including the failure to compel a Drug Enforcement Administration (DEA) chemist to testify on their behalf, the exclusion of certain evidence, and the formulation of a jury instruction. In that appeal, we upheld the jury instruction, but vacated Defendants' convictions and remanded the case for the district court to determine whether the DEA chemist's testimony was material to their case. *United States v. Ritchie*, 734 F. App'x 876 (4th Cir. 2018) (*Ritchie II*). On remand, the district court held the chemist's testimony was not material and declined to compel his presence at trial. *United States v. Ritchie*, No. 4:15-cr-18, 2018 WL 4693811 (E.D. Va. Sept. 28, 2018) (*Ritchie III*). Defendants now appeal that decision and renew several other evidentiary challenges that we declined to address in the prior appeal. As discussed below, we affirm in part, reverse in part, vacate Defendants' convictions, and remand for a new trial.

I.

A.

Federal law prohibits the distribution of a controlled substance analogue. *See* 21 U.S.C. §§ 813, 841(a)(1). The Analogue Act defines "controlled substance analogue" as

3

a substance—

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). Because an Analogue Act conviction requires proof of a defendant's knowledge and intent, that is, his mens rea, the Government must show that he knew either that the substance at issue is a controlled substance or that it is "substantially similar" to a controlled substance in both chemical structure and physiological effects. *See id.* This Court has explained that a person has violated the Analogue Act if he

> (1) distributed a substance that had the chemical structure of an analogue and the actual, intended, or claimed physiological effects of an analogue; (2) intended that the substance be used for human consumption; and (3) knew either the legal status of the substance, or the chemical structure and physiological effects of that substance.

*United States v. McFadden*, 823 F.3d 217, 223 (4th Cir. 2016).

B.

From 2010 to 2013, Defendants operated Zencense Incenseworks, LLC, which had facilities in Pensacola, Florida, and Las Vegas, Nevada. Zencense manufactured and sold a substance commonly called "spice," which contained a mix of crushed leaves and

4

chemical additives. Consumers would generally smoke the spice, but Defendants packaged the product as "incense" and labeled it "Not for human consumption." J.A. 633. In late March or early April 2012, Defendants began using the chemical additives XLR-11 and UR-144 in their manufactured spice. These additives were not on the controlled substances drug schedule during the time period of the alleged conspiracy (February 8, 2012 to April 30, 2013).[1] Defendants shipped their product around the country for sale by various retailers, including one in Hampton Roads, Virginia, which received a shipment on August 9, 2012.[2]

The Government had begun investigating Zencense's operations because it suspected Defendants' "incense" was actually synthetic marijuana, i.e., a substance "designed and intended to have an effect similar to controlled substances" (marijuana) when smoked. J.A. 110. In the Government's view, this physiological effect, coupled with the chemical similarity of the additive XLR-11 to the controlled chemical in marijuana, JWH-018, makes Defendants' spice a controlled substance analogue within the meaning of 21 U.S.C. § 802(32)(A). On that basis, the Government charged Defendants with conspiring to distribute controlled substances and controlled substance analogues, in violation of 21 U.S.C. §§ 846, 813; using a communication facility to promote unlawful activity, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2; using a facility in interstate commerce to promote unlawful activity, in violation of 18 U.S.C.

---

[1] XLR-11 and UR-144 have been treated as identical substances in this case. Unless otherwise stated, reference to one is reference to the other.

[2] Though the shipment may have occurred on August 8, 2012, the invoice is dated August 9, so we rely on that date.

§§ 1952(a)(3), 2; and distributing controlled substances and controlled substance analogues, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2.

At Defendants' joint trial, the Government had to prove a scientific element as to the spice and a mens rea element as to each Defendant. To establish the scientific element, the Government had to show that XLR-11 in the spice had properties "substantially similar" to the properties of JWH-018 in marijuana. *See* 21 U.S.C. § 802(32)(A). And to establish the mens rea element, the Government had to satisfy one of two methods of proof: either that Defendants knew XLR-11 was a controlled substance analogue or that they knew the "chemical structure and physiological effects" of XLR-11 were substantially similar to those of JWH-018. *See McFadden*, 823 F.3d at 223. The Government proceeded under the second method of proof and attempted to "establish that 'the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue.'" *Id.* (quoting *McFadden v. United States*, 135 S. Ct. 2298, 2305 (2015)). "Under this second method of proof, knowledge of the substance's chemical structure and physiological effects is sufficient to support a conviction." *Id.* Defendants challenged both the scientific and mens rea elements of the Government's case, contending XLR-11 is not chemically similar to JWH-018 and asserting they lacked knowledge of any similarity between the structures or physiological effects of the two chemicals.

Defendants' first trial resulted in a hung jury on each count. During a second trial, the jury indicated it was at an impasse on the issue of substantial similarity, and the

6

district court issued an *Allen* charge.[3] The jury then convicted Defendants of all counts.

## C.

Defendants appealed, challenging a number of the trial court's rulings. Our opinion addressed only two issues: the court's refusal to compel DEA chemist Dr. Arthur Berrier to testify for Defendants and its formulation of a mens rea jury instruction. *See Ritchie II*, 734 F. App'x at 878–81.

Defendants framed Dr. Berrier's exclusion from trial as a Sixth Amendment compulsory process violation. *See id.* at 878–79. Under the Sixth Amendment, a criminal defendant "enjoy[s] the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Though "not absolute," *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003), this right is violated when a defendant is "arbitrarily deprived of testimony that would have been relevant and material, and vital to the defense," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (internal quotation marks, alterations, and emphases omitted). To establish a Sixth Amendment violation, a criminal defendant "must at least make some plausible showing of how [the excluded] testimony would have been both material and favorable to his defense." *Id.*

Exercising their compulsory process rights prior to trial, Defendants issued a "*Touhy* request"[4] to the Government along with a subpoena for Dr. Berrier.[5] The

---

[3] *Allen v. United States*, 164 U.S. 492 (1896). *See United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015) (explaining that an *Allen* charge is a supplemental jury instruction given "when the jury has reached an impasse in its deliberations and is unable to reach a consensus").

7

Government denied the *Touhy* request, claiming Dr. Berrier's opinion formed in the course of his employment with the DEA was covered by the Government's deliberative process privilege. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (noting the deliberative process privilege covers written "opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" (internal quotation marks omitted)). The district court agreed with the Government and quashed the subpoena, thereby rejecting Defendants' compulsory process arguments. When Defendants challenged the district court's privilege ruling on appeal, we held that the Government had waived its privilege as to Dr. Berrier's XLR-11 opinion because he had offered it in other cases and made it publicly available online. *Ritchie II*, 734 F. App'x at 879. But we then noted that

> [t]he absence of a privilege does not end the inquiry, however, because the Defendants' compulsory process right extends only to "favorable" and "material" witnesses and evidence. Dr. Berrier's testimony is clearly favorable to the Defendants, but the district court did not consider materiality, and we leave it to that court to determine in the first instance. If Dr. Berrier's testimony is material and otherwise admissible, the

---

[4] *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). Under 5 U.S.C. § 301 and *Touhy*, federal agencies may regulate their employees' ability to testify about their work, *United States v. Soriano-Jarquin*, 492 F.3d 495, 504 (4th Cir. 2007), but criminal defendants may seek such agency employees' testimony at trial via what are now termed "*Touhy* requests," *see id.*; *Smith v. Cromer*, 159 F.3d 875, 879 (4th Cir. 1998) (describing the interplay of *Touhy* requests and witness subpoenas).

[5] Dr. Berrier is no longer a DEA employee, but whether the district court properly excluded his testimony depends on the facts before the district court when Defendants issued the *Touhy* request to the Government. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1019 (10th Cir. 2004) ("As a reviewing court, we may only 'evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.'" (quoting *Old Chief v. United States*, 519 U.S. 172, 182 n.6 (1997))).

8

Defendants' Sixth Amendment rights were violated by his exclusion from the trial.

*Id.*

We vacated Defendants' convictions and remanded to the district court the initial determination of whether Dr. Berrier's testimony would be material. Further, we exercised our discretion to address Defendants' challenge to the jury instruction as that issue was "likely to recur" and then affirmed the district court's use of the instruction. *Id.* (quoting *United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 406 (4th Cir. 2012)).

On remand, the district court concluded that Dr. Berrier's testimony was not material to Defendants' case because it would have been "merely cumulative" to testimony from Defendants' two other expert chemists. *Ritchie III*, 2018 WL 4693811, at *4. The district court determined that those chemists used the same methods and came to the same conclusion as Dr. Berrier, and that his "position at the DEA would not provide any new relevant information" to the jury. *Id.* The court accordingly held that Dr. Berrier's exclusion from the trial did not violate Defendants' Sixth Amendment compulsory process rights.

Defendants now bring a second appeal.[6][7]

---

[6] Unless otherwise stated, all references to rulings made "at trial" refer to the district court's rulings applicable to Defendants' second trial, which occurred before the first appeal and remand.

[7] While it is unclear whether Galecki joined all of Ritchie's arguments below, he has joined Ritchie's briefs on appeal and has not indicated that he departs from any of Ritchie's arguments. We will therefore assume that Galecki joins all of Ritchie's (Continued)

9

To challenge the scientific element of the Government's case—that XLR-11 is substantially similar to JWH-018—Defendants sought to compel the expert testimony of Dr. Berrier, a Senior Research Chemist in the DEA's Office of Forensic Sciences ("OFS"). Dr. Berrier would have opined that XLR-11 and JWH-018 are not substantially similar in chemical structure. While another DEA office, the Drug and Chemical Evaluation Section ("DRE") in the Office of Diversion Control, ultimately classifies controlled substance analogues, it regularly consults the OFS before making its decisions. As an OFS chemist, Dr. Berrier routinely analyzed synthetic substances for the DRE and gave his opinion on their substantial similarity to controlled substances. In the spring of 2012, the DRE asked Dr. Berrier to compare UR-144 to JWH-018.[8] He concluded that they are not substantially similar in chemical structure. But ultimately, after the charged events, the DRE determined that UR-144 and JWH-018 are substantially similar, making UR-144 a controlled substance analogue. The DEA formally added UR-144 and XLR-11 to the controlled substances drug schedule in 2013, after the alleged conspiracy ended.

arguments. Moreover, where the district court's rulings applied equally to Defendants because they were business partners in constant communication during the alleged conspiracy and did not seek severance of their joint trial, our holdings apply to both Defendants as well. *See United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) ("[I]t is manifestly unjust to reverse the conviction of one co-defendant but to uphold the conviction of another co-defendant when the same error affected both defendants." (internal quotation marks omitted)).

[8] Dr. Berrier analyzed UR-144 for the DRE, but it is undisputed that his opinion would have applied to XLR-11 as well.

Defendants argued that Dr. Berrier's testimony was crucial to their case, as he was a DEA synthetic cannabinoid expert with a dissenting view—a view demonstrating that even highly-trained Government employees disagreed about the substantial similarity of XLR-11 and JWH-018. Indeed, one of the Government's expert witnesses at trial was Dr. Jordan Trecki, a pharmacologist in the DRE section of the DEA who testified about the effects and substantial similarity of XLR-11 to JWH-018. As discussed above, Defendants unsuccessfully sought to compel Dr. Berrier's testimony on their behalf.

Barred from questioning Dr. Berrier, Defendants relied on the expert testimony of two chemistry professors, Drs. Croatt and Dudley, who gave the same opinion that Dr. Berrier would have given—an opinion that contradicted Dr. Trecki's. During cross-examination, the Government questioned Defendants' "hired guns" about the compensation they received for testifying. In convicting Defendants, the jury ultimately rejected Drs. Croatt and Dudley's expert opinion about XLR-11 and JWH-018.

B.

In this appeal, we are reviewing the district court's determination that Dr. Berrier's exclusion from trial did not violate Defendants' Sixth Amendment rights since his testimony would have been cumulative and not material to their defense. We disagree and therefore reverse the district court's materiality finding, vacate Defendants' convictions, and remand for a new trial. *See United States v. Rhynes*, 218 F.3d 310, 323 (4th Cir. 2000) (en banc) (holding that a Sixth Amendment constitutional violation occurred and remanding for a new trial).

11

C.

Before addressing the materiality issue on the merits, we first note that it is unclear what standard of review applies to a materiality ruling in the Sixth Amendment context. We and our sister circuits apply no uniform standard of review to either the issue of materiality in a compulsory process challenge or to evidentiary issues underlying general Sixth Amendment challenges.

With regard to compulsory process claims, our sister circuits apply both the *de novo* and abuse of discretion standards of review, even at times applying different standards in the same circuit without explanation. *Compare United States v. Tuma*, 738 F.3d 681, 688 (5th Cir. 2013) (reviewing compulsory process claim *de novo*), *United States v. Damra*, 621 F.3d 474, 485 (6th Cir. 2010) (same), *United States v. Bahamonde*, 445 F.3d 1225, 1228 (9th Cir. 2006) (same), *and United States v. Serrano*, 406 F.3d 1208, 1214–15 (10th Cir. 2005) (same), *with United States v. Ross*, 703 F.3d 856, 877–78 (6th Cir. 2012) (reviewing compulsory process claim for abuse of discretion), *United States v. Youngman*, 481 F.3d 1015, 1017 (8th Cir. 2007) (same), *and United States v. Gary*, 74 F.3d 304, 309–10 (1st Cir. 1996) (same). Within the compulsory process context, it is often unclear what standard of review applies to an underlying materiality issue like the one presented here.

Not only that, but the circuits take a variety of approaches to reviewing Sixth Amendment claims that stem from issues like the exclusion of evidence or the denial of a motion to continue. *Compare United States v. Rivas*, 831 F.3d 931, 934 (7th Cir. 2016) (reviewing an evidentiary ruling for abuse of discretion but reviewing the overarching

Sixth Amendment Confrontation Clause claim *de novo*), *and United States v. Woodard*, 699 F.3d 1188, 1193–94 (10th Cir. 2012) (reviewing an evidentiary ruling *de novo* because the defendant framed it as a Confrontation Clause violation), *with United States v. Blum*, 62 F.3d 63, 67 (2d Cir. 1995) (reviewing an evidentiary ruling for abuse of discretion without announcing a separate standard of review for the overarching compulsory process challenge).

Consequently, when faced with an issue presented under the Sixth Amendment, our sister courts often decline to decide the standard of review question and instead analyze the district court's ruling under either standard. *E.g.*, *United States v. Epskamp*, No. 15-2028-cr, 2016 WL 4191126, at \*2 (2d Cir. Aug. 5, 2016) (summary order) (affirming under either standard of review the district court's refusal to postpone a trial despite the government's failure to secure testimony of an individual incarcerated outside the United States); *United States v. Ladoucer*, 573 F.3d 628, 634–35 (8th Cir. 2009) (affirming under either standard of review the district court's refusal to postpone a trial despite a defense witness's failure to appear).

Another common approach we often employ is simply refraining from announcing a separate standard of review for each issue. *See United States v. Beyle*, 782 F.3d 159, 171 (4th Cir. 2015) (announcing no standard for reviewing the overarching compulsory process challenge and reviewing the district court's refusal to compel witnesses for abuse of discretion); *United States v. Woods*, 710 F.3d 195, 200–02 (4th Cir. 2013) (doing the same and reviewing the district court's exclusion of testimony for abuse of discretion); *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009) (doing the same and

13

reviewing the district court's quashing of subpoenas to CIA officials for abuse of discretion); *Soriano-Jarquin*, 492 F.3d at 497, 501–02 (doing the same and reviewing the district court's denial of a motion to dismiss the indictment *de novo*); *Cromer*, 159 F.3d at 882–83 (doing the same and reviewing the district court's grant of a protective order quashing subpoenas *de novo*); *United States v. Espinoza*, 641 F.2d 153, 159 (4th Cir. 1981) (doing the same and reviewing the district court's refusal to issue subpoenas for abuse of discretion).

Here, the district court found Dr. Berrier's testimony immaterial and then excluded him from trial by declining to compel him to testify. The Parties seem to agree that the exclusion of Dr. Berrier was an evidentiary ruling, which we review for abuse of discretion and harmlessness, *United States v. McLean*, 715 F.3d 129, 143 (4th Cir. 2013), but they do not directly address the standards of review applicable to the underlying materiality ruling or the overarching Sixth Amendment claim.

When previously faced with a materiality question similar to the one Defendants now present, we declined to decide it and instead affirmed under either standard of review. *United States v. Moussaoui*, 382 F.3d 453, 473 n.22 (4th Cir. 2004) ("The parties dispute whether the materiality determinations by the district court [in a compulsory process claim] are reviewed *de novo* or for abuse of discretion. We do not decide this question . . . ."). And we need not decide this question here. Under either standard, we would reverse the district court's finding that Dr. Berrier's testimony was not material and reverse its exclusion of his testimony. Therefore, we will refrain from announcing the

14

standard of review applicable to the underlying materiality determination or to the overarching Sixth Amendment compulsory process challenge.

For conducting the materiality analysis on the merits, however, we do have clear guidance from the Supreme Court in *Valenzuela-Bernal*. 458 U.S. at 867–74. In that case, the Court concluded the district court properly denied the defendant's motion to dismiss the indictment on compulsory process grounds because, although the Government had removed potential defense witnesses from the country, the defendant had failed to "explain what material, favorable evidence the deported [witnesses] would have provided for his defense." *Id.* at 874. In deciding *Valenzuela-Bernal*, the Supreme Court noted that materiality has several components: it must be exculpatory; it must be "not merely cumulative to the testimony of available witnesses;" it must present "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact;" and it must be otherwise admissible. *See id.* at 873–74. A district court assessing the materiality of evidence must address these components in the context of the entire record. *Id.* at 874; *see Moussaoui*, 382 F.3d at 472.

## D.

The district court "assume[d] for the sake of argument that Dr. Berrier's testimony may have been admissible and exculpatory," *Ritchie III*, 2018 WL 4693811, at *3, and rested its materiality decision on the testimony being cumulative. In particular, the court determined Dr. Berrier's testimony would have been cumulative because Drs. Croatt and Dudley gave the same opinion and used the same methods as Dr. Berrier. Because the

15

jury had rejected the testifying experts' opinion, the district court held that Dr. Berrier's similar testimony would not have altered the trial's outcome.

We can easily affirm the district court's decision on two of the components of materiality, as Dr. Berrier's testimony was indeed exculpatory and admissible. It was exculpatory because Defendants could have supported their case theory—that the substantial similarity of XLR-11 and JWH-018 was a difficult question—with evidence that even highly-trained DEA scientists disagreed about the answer. His testimony also would have been admissible because it was highly relevant and violated no Federal Rules of Evidence.

But we disagree with the district court's analysis of the "not merely cumulative" component, as we conclude that Dr. Berrier's testimony was qualitatively different from the testimony of the other defense witnesses. In stark contrast to Drs. Croatt and Dudley, Dr. Berrier was not paid outside his DEA employment to form his opinion about XLR-11's chemical similarity to JWH-018. Nor would Defendants have paid him to testify at trial. Consequently, the Government could not have impeached Dr. Berrier in front of the jury for having a pecuniary motive for testifying. Dr. Berrier's inability to be impeached on that ground made his testimony unique and particularly relevant, not cumulative. *See Thomas v. Westbrooks*, 849 F.3d 659, 666 (6th Cir. 2017) (noting "impeachment on the basis of pecuniary bias is fundamentally different" from impeachment for other reasons).[9]

---

[9] We do not comment on the possible subjects of impeachment available to the Government in cross-examining Dr. Berrier if he is called to testify at a new trial. That is for the trial court to decide in the first instance.

16

Also unlike Drs. Croatt and Dudley, Dr. Berrier could have rebutted the testimony of Dr. Trecki, the Government's DEA expert, with his own knowledge of the DEA's processes and analyses. His expert testimony, which diverged from Dr. Trecki's, could have shown the jury that the DEA's own scientists could not agree on the substantial similarity of the chemicals at issue. Drs. Croatt and Dudley could not have provided that type of rebuttal testimony.

And finally, Dr. Berrier's testimony was material to the chemical structure issue because presenting it to the jury could reasonably have resulted in a different trial outcome. The jurors struggled to decide whether XLR-11 is substantially similar to JWH-018, as indicated by their note to the district court that they were "basically hung on Count 1, substantially similar." J.A. 2048. That note prompted the court to issue an *Allen* charge, after which the jury convicted Defendants. Had Defendants presented testimony from someone who opined on that very issue in the course of his duties at the DEA, the jury could have entertained reasonable doubt about whether XLR-11 and JWH-018 are substantially similar in chemical structure.

The Government asserts that any error in excluding Dr. Berrier was harmless and thus does not warrant reversal. Not so. A constitutional error is harmless only "if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Sayles*, 296 F.3d 219, 223 (4th Cir. 2002) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). Here, the jury's difficulty with the substantial similarity issue suggests that Dr. Berrier's testimony was "evidence upon which [the] jury could have reached a contrary finding." *See Rhynes*, 218 F.3d at 323

17

(internal quotation marks omitted). Defendants "genuinely contested" the substantial similarity of XLR-11 and JWH-018 at every turn, and Dr. Berrier was uniquely situated "to rebut much of the Government's [scientific] evidence against [them]." *See id.* (internal quotation marks omitted); *see also United States v. Yarbrough*, 527 F.3d 1092, 1103 (10th Cir. 2008) (holding the defendant's "substantial rights were affected" when "the district court's error deprived [him] of important evidence relevant to a sharply controverted question going to the heart of [his] defense"). Accordingly, we harbor doubt about whether the jury would have convicted Defendants if Dr. Berrier had testified, and we hold that his exclusion from trial was a Sixth Amendment violation that was "not harmless." *See Rhynes*, 218 F.3d at 323.[10]

Even if Defendants would have made different strategic choices had Dr. Berrier been made available to them—for example, calling only one of the other expert chemists—the court improperly denied them the opportunity to present favorable, material evidence. *See Valenzuela-Bernal*, 458 U.S. at 867. Under either the *de novo* or abuse of discretion standard of review, we hold that the district court wrongly quashed

---

[10] Since we hold the district court's error was not harmless under the harmless error standard applicable to constitutional decisions, it also was not harmless under the lower harmless error standard applicable to pure evidentiary decisions. *See United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014) (contrasting the two harmless error thresholds and noting a pure evidentiary error is not harmless if it had a "'substantial and injurious effect or influence in determining the jury's verdict'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))).

the subpoena to Dr. Berrier. We therefore reverse the district court's materiality ruling, vacate Defendants' convictions and remand for a new trial.[11]

## III.

We now turn to the district court's exclusion of certain defense evidence. To negate the mens rea element of the Government's case—that Defendants knew XLR-11 was substantially similar to JWH-018 in chemical structure and physiological effects—Defendants proffered evidence to demonstrate that they had innocent intent when shipping their spice to Virginia on August 9, 2012. The court excluded this evidence, which came from three sources: DEA Special Agent Claude Cosey, attorney David McGee, and Defendant Ritchie. Defendants argue the exclusion of this evidence is reversible error. But before assessing the district court's rulings, we will address three preliminary matters.

### A.

#### 1.

First, these issues are now before us for the second time. We exercise our discretion to address Defendants' claims because we are remanding for a new trial and

---

[11] In any further proceedings, the Government has the option to grant the *Touhy* request as to Dr. Berrier, dismiss the indictment, or endure a sanction. *See United States v. Rivera*, 412 F.3d 562, 570 (4th Cir. 2005) ("If the evidence is material to the defense, then the government must provide the evidence or, in most cases, dismiss the prosecution."); *Moussaoui*, 382 F.3d at 476 (concluding that excluded witnesses' testimony was material and noting "the choice is the Government's whether to comply with [the relevant] orders or suffer a sanction").

the issues are "likely to recur on remand." *Drakeford*, 675 F.3d at 406. The Government incorrectly argues that Defendants waived the undecided claims from the first appeal because they did not press those claims in the district court on remand. On the contrary, Defendants had no opportunity to reassert their claims in the district court before the current appeal, given the limited remand and the district court's materiality ruling. Our decision to "not address" every issue in the first appeal, *Ritchie II*, 734 F. App'x at 879 n.7, had no bearing on the merits of the unaddressed claims. We created no "law of the case" as to them and we will address in turn the claims Defendants have raised again in this appeal. *See Brittingham v. Jenkins*, No. 91-1245, 1992 WL 172092, at *5 & n.4 (4th Cir. July 23, 1992) (unpublished table decision) (per curiam).[12]

2.

Second, although we generally review evidentiary rulings for abuse of discretion, *McLean*, 715 F.3d at 143, Defendants ask us to review the district court's exclusion of the proffered testimony of Cosey and McGee *de novo* because it arises in the context of a Sixth Amendment claim.[13] As noted above, we often analyze trial court rulings underlying Sixth Amendment claims without announcing a separate standard of review for the overarching constitutional challenge. We will do likewise here, reviewing the district court's exclusions of the Cosey and McGee evidence for abuse of discretion and

---

[12] As for Defendants' renewed mens rea jury instruction claim, however, we have already established that the district court properly instructed the jury. *Ritchie II*, 734 F. App'x at 879–81. We will not disturb that decision, which is the law of the case.

[13] Defendants have not framed the exclusion of Ritchie's testimony as a Sixth Amendment violation, so we will review that evidentiary ruling for abuse of discretion.

20

harmlessness. *See McLean*, 715 F.3d at 143. Even if we undertook a *de novo* review as to these two witnesses, however, our decisions would not change.

3.

Third, we must address Defendants' argument that they should have been allowed to present evidence of their innocent intent outside the confines of a recognized affirmative defense. In an effort to circumvent the district court's rejection of their various affirmative defenses, Defendants contend that the evidence in question is nonetheless admissible to demonstrate their innocent intent. In contrast to an affirmative defense, which "excuses punishment for a crime the elements of which have been established and admitted," *United States v. Thompson*, 554 F.3d 450, 452 n.2 (4th Cir. 2009) (internal quotation marks omitted), an innocent intent defense negates the mens rea element of the charged offenses. However, this Court has not previously permitted an innocent intent defense and we need not determine whether to do so here in order to resolve this appeal.

We understand that at least two district courts examining similar facts to those before us have allowed defendants to present innocent intent evidence, even when that evidence was insufficient to support an affirmative defense. *See United States v. Way*, No. 1:14–cr–00101–DAD–BAM–1, 2018 WL 3062159, at *1–3 (E.D. Cal. June 19, 2018) (compelling Agent Cosey to testify about his conversations with Ritchie as evidence of defendant Way's innocent intent in facilitating Zencense's operations); *United States v. Ritchie*, No. 2:15-cr-00285-APG-PAL, 2018 WL 6580570, at *3–4 (D. Nev. Dec. 13, 2018) (allowing defendants Ritchie and Galecki to present evidence of

Agent Cosey's conversations with Ritchie to demonstrate their innocent intent). Those decisions, of course, are not precedential or binding on us.

Nor are decisions from our sister circuits binding, and only one of those courts has expressly recognized the innocent intent defense. *See United States v. Alvarado*, 808 F.3d 474, 486 (11th Cir. 2015) (explaining a defendant may "effectively backdoor the rejected [public authority] defense by testifying that he genuinely believed" that the government directed and approved of his conduct); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) (collecting cases); *see also United States v. Xiong*, 914 F.3d 1154, 1159–60 (8th Cir. 2019) (leaving undisturbed the district court's admittance of innocent intent defense evidence even though it did not support the public authority and entrapment by estoppel affirmative defenses). The Eleventh Circuit has also noted the uniqueness of its position, observing that it "may be the only circuit to explicitly allow an innocent intent defense in this context." *Alvarado*, 808 F.3d at 487. Moreover, the Second Circuit has criticized the Eleventh Circuit's view as an "'unwarranted extension'" of the established affirmative defenses. *United States v. Giffen*, 473 F.3d 30, 43 (2d Cir. 2006) (quoting *United States v. Wilson*, 721 F.2d 967, 975 (4th Cir. 1983), in which we affirmed the district court's refusal to instruct the jury on the "good faith" defense of reliance on official authority because the evidence did not support it). In the Second Circuit's view, allowing defendants to assert an innocent intent defense would "'grant any criminal *carte blanche* to violate the law should he subjectively decide'" that he served some higher, innocent purpose, a lenience which would "swallow the actual

22

public authority and entrapment-by-estoppel defenses." *Id.* (quoting *Wilson*, 721 F.2d at 975).

We thus are not alone in hesitating to recognize the innocent intent defense. But setting aside the limited value of those decisions, we need not decide here whether to permit an innocent intent defense in this Circuit because we can resolve Defendants' arguments apart from that defense.

B.

Finally, we come to the merits of Defendants' evidentiary challenges, bearing in mind that we may only assess whether the evidence was properly excluded for the reason Defendants proffered it—to negate the mens rea element of the Government's case. *See Ramming Real Estate Co. v. United States*, 122 F.2d 892, 893 (8th Cir. 1941) ("Where a litigant seeks a reversal upon a ruling of the court rejecting evidence offered for a specific purpose, he [cannot] in the appellate tribunal change . . . the ground or theory upon which he asked the lower court to admit the testimony."); *accord Shepard v. United States*, 290 U.S. 96, 102–03 (1933). For the reasons below, we hold that the district court did not abuse its discretion in excluding Cosey's testimony and affirm that evidentiary ruling. With regard to McGee's and Ritchie's testimony, however, we vacate the district court's exclusion of that evidence and remand for further proceedings.

1.

a.

*Agent Cosey:* On July 25, 2012, law enforcement officers inspected Zencense's production warehouse in Las Vegas, Nevada. Agent Cosey did not participate in that

23

"raid," but heard about it and called Ritchie, who invited him to visit the Zencense facility on Burgess Road in Pensacola, Florida. Cosey met Ritchie there the next day. Ritchie showed him the facility, described the spice manufacturing and packaging process, identified the spice's chemical additives, and gave Cosey lab reports and spice samples. At one point Ritchie said to Cosey that "if [Cosey] told [Ritchie] he was doing anything illegal, he would close it down that day." J.A. 2087. Cosey testified in his deposition that he did not know at that time whether the spice contained a controlled substance or analogue and he offered no opinion to Ritchie that what he was doing was either legal or illegal.

Cosey and Ritchie met again in Pensacola on September 13. Along with other law enforcement officers, Cosey inspected a Zencense facility on Copter Road with Ritchie, who also met privately with Cosey and other officers and obliquely discussed the legality of his business. Ritchie said to them, "I know if law enforcement wants to put somebody out of business that's not doing anything illegal, there's means to do it." J.A. 2101. He reiterated that selling Zencense's spice was "not illegal," J.A. 2102, but told Cosey "that if his products were made illegal, if those additives in his products were made illegal, that he would destroy the product right then and there." J.A. 2109–10. Cosey responded, "If what you are producing and distributing is not a controlled substance, I cannot—law enforcement cannot and will not engage—or interfere in your, you know, ability to conduct commerce." J.A. 2101.

The officers then drove to Zencense's Burgess Road location and Ritchie continued his conversation with Cosey and the officers by asking, "Am I going to

24

continue to be looked at, targeted by law enforcement?" J.A. 2106. Cosey responded, "While what you are doing may be legal now, it could change in the future." J.A. 2106. He further explained, "[J]ust because something is legal today doesn't mean it might not be illegal in the future, because the compounds are constantly—they are adding compounds to the banned list all the time." J.A. 2107.

Before trial, Defendants sought, through a *Touhy* request, to compel Cosey to testify about these conversations to establish the affirmative defense of entrapment by estoppel. *See United States v. Clark*, 986 F.2d 65, 69 (4th Cir. 1993) ("The defense of entrapment by estoppel is available when a government official tells the defendant that certain activity is legal, the defendant commits the activity in reasonable reliance on that advice, and prosecution for the conduct would be unfair."). The district court declined to compel Cosey's testimony, holding that the proffered evidence was insufficient to establish the entrapment by estoppel defense because the spice business had been in full swing for months when Ritchie first talked to Cosey. The court explained that the element of reasonable reliance was missing: "[Y]ou cannot rely on something that happened seven months later to try to raise the suggestion that there was some reliance on something the government said . . . when the illegal conduct is up and running seven months before." J.A. 356–57.

In light of this ruling, Defendants changed course and proffered the same testimony as general evidence that they lacked the mens rea required to violate the Analogue Act. They argued that on August 9, the date of the first charged spice shipment to Virginia, they believed distributing spice containing XLR-11 was legal because Cosey

25

never told Ritchie on July 26 that doing so was illegal. The district court denied Defendants' alternate proffer as a "backdoor way to circumvent the Court's ruling" and reiterated that Cosey's testimony was inadmissible because he spoke to Ritchie after the spice enterprise was fully operational. J.A. 357.

b.

We affirm the district court's exclusion of Cosey's testimony because it was irrelevant in two ways. First, Cosey never indicated that selling XLR-11 was legal. Each time Ritchie asked whether his business was lawful, Cosey responded noncommittally, saying things like, "If what you are producing and distributing is not a controlled substance, . . . law enforcement cannot and will not . . . interfere in your . . . ability to conduct commerce." J.A. 2101. Even Cosey's warning on September 13 that "just because something is legal today doesn't mean it might not be illegal in the future," J.A. 2107, was not an affirmative statement that selling XLR-11 was currently legal. Nothing Cosey said to Defendants could reasonably support a reliance on an official representation that their actions were lawful, so Cosey's testimony could not reveal Defendants' mens rea on that point.

Second, Cosey's testimony is not probative of Defendants' mens rea because his conversations with Defendants were unrelated to the similarity of XLR-11 and JWH-018. As Cosey's September 13 conversation with Ritchie occurred after the August 9 shipment, it is irrelevant to showing Defendant's intent on August 9. But even the July 26 conversation, which followed months of Defendants' regular sales of spice with XLR-11 but preceded the August 9 shipment, would not have tended to negate Defendants'

26

knowledge of substantial similarity on August 9. This is because Cosey simply inspected the Zencense facilities and did not discuss the chemical structure or effects of XLR-11 or JWH-018 with Defendants on July 26. In fact, Cosey stated in his deposition that he could not verify Ritchie's description of the spice's contents on July 26 because he had not yet seen a DEA lab report on the substance. Therefore, Cosey did not know whether the spice contained XLR-11, and none of his comments to Defendants could have negated their knowledge of whether their spice additive was substantially similar to JWH-018. Cosey's proffered testimony is thus irrelevant, and the district court did not abuse its discretion in excluding it. *See* Fed. R. Evid. 401(a) (noting that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence").[14]

---

[14] To bolster their innocent intent argument, Defendants cite *United States v. Makkar*, 810 F.3d 1139 (10th Cir. 2015), an out-of-circuit case in which the defendants were charged with distributing a controlled substance analogue via "incense." *Id.* at 1147–48. To show they lacked knowledge of the substance's chemical structure, those defendants proffered evidence that "they asked state law enforcement agents to test the incense to assure its legality under state law—and that they offered to stop selling the incense until the results came in." *Id.* at 1147. The district court excluded the evidence, but the Tenth Circuit reversed, holding the defendant's proffer was not "merely cumulative" and characterizing it this way:

> As a matter of common sense and our collective experience, we have a hard time imagining more powerful proof that a defendant didn't know the chemical composition of a drug, and didn't know it was substantially similar to an unlawful substance, than evidence that he turned to law enforcement for information about the drug's composition and offered to suspend sales until tests could be performed.

*Id.* at 1147–48. Defendants here argue that because they, too, "turned to law enforcement" for advice, *see id.* at 1148, Cosey's testimony should have been admitted as proof of their innocent intent.
(Continued)

27

We therefore affirm the district court's exclusion of Cosey's irrelevant testimony. As any error in excluding it did not "affect the outcome of [the] case," *see Ferguson*, 752 F.3d at 619, it was harmless, and we hold the district court did not violate Defendants' compulsory process rights by excluding Cosey from testifying.

2.

a.

*Attorney McGee:* In late July or early August 2012, after federal officials began investigating Zencense, Defendants contacted Florida attorney David McGee to represent them. After conducting some preliminary research, McGee agreed to represent Defendants. They retained him on August 6, three days before the first charged shipment. At points during McGee's representation of Defendants, he consulted chemists about the chemical structures of XLR-11 and JWH-018, and several chemists opined to him that

---

Not only do Defendants rely on a case we need not follow, but their analogy is critically flawed. The *Makkar* defendants were only retailers of the incense and thus disputed their knowledge of the ingredients' chemical structure and physiological effects. That is, they challenged the first of the two Analogue Act requirements the Government has to prove when it proceeds under the substantial similarity method of proof. *McFadden*, 823 F.3d at 223; *see* 21 U.S.C. § 802(32)(A). Here, Defendants were spice producers and are not challenging that they knew the chemical structure of XLR-11. They admit that they reformulated their spice to include XLR-11 based on their customers' demands and routinely acquired detailed lab reports identifying the spice's composition. Defendants are instead challenging the second element the Government must prove: that Defendants knew (based on its chemical structure and physiological effects) that XLR-11 and JWH-018 were "substantially similar" within the meaning of 21 U.S.C. § 802(32)(A). Because *Makkar*'s holding addressed the first Analogue Act requirement, not the second, it has no bearing on our decision here.

28

the chemicals are not substantially similar. McGee kept Defendants apprised of his research.

After Defendants were indicted, McGee represented them in pretrial proceedings below. During a hearing on the propriety of McGee's joint representation of Defendants, the district court asked him whether Defendants intended to assert the affirmative defense of advice of counsel. McGee responded that they would not use that defense because he "never" advised them that selling XLR-11 was legal:

> THE COURT: Well, you know, what are your main defenses in this case? I don't know whether you want to reveal your defense strategy—
>
> MR. McGEE: I have revealed my defense strategy to the government since January of 2013. It has not changed, it will not change. They know what our defense is.
>
> THE COURT: . . . . Is one of the potential defenses that they acted pursuant to legal counsel?
>
> MR. McGEE: Not Mr. Miller or myself. There is a possibility that one of the defenses will be another lawyer before us, not us, gave them advice with regard to the legality of these substances. It was not Mr. Miller, it was not myself . . . .
>   . . . . We have never given such advice and would not give such advice.

Supp. J.A. 12–13. The district court ultimately disqualified McGee from jointly representing Defendants, and they each retained new counsel.

Yet when Defendants secured new counsel, one of the affirmative defenses raised was reliance on McGee's legal advice that XLR-11 was not substantially similar to JWH-018 because some chemists had reached that conclusion and told McGee. The district court prohibited Defendants from asserting that defense because they could not establish

29

its three elements: sharing relevant facts with counsel, receiving legal advice based on those facts, and reasonably relying on that advice. *See United States v. Perry*, 30 F. Supp. 3d 514, 541 (E.D. Va. 2014) (listing the defense's elements). The district court found that Defendants did not disclose all relevant facts to McGee because an Analogue Act distribution offense requires distribution of a product "for human consumption," *see McFadden*, 823 F.3d at 223, but Defendants labeled theirs "[n]ot for human consumption," J.A. 633, and never told McGee consumers were smoking it. Further, Defendants "consulted counsel *after* [they were] already engaged in selling spice . . . with UR-144 and XLR-11 for human consumption," so they did not sell it in reliance on McGee's advice. Memorandum Order at 7, United States v. Ritchie, No. 4:15-cr-18-RAJ-LRL (E.D. Va. Oct. 3, 2016), ECF No. 462.

After the district court barred reliance on the advice of counsel defense, Defendants changed course again and offered McGee's testimony for the same purpose they alternatively proposed for Agent Cosey's. That is, outside of the affirmative defense, the same evidence was proffered as general evidence of Defendants' lack of mens rea in selling XLR-11. Defendants now represented McGee's discussions with the chemists as showing they relied on their attorney's belief that their August 9 spice shipment was legal because it did not contain a controlled substance analogue.

The district court excluded McGee's testimony as hearsay, explaining that "the state-of-mind exception [to hearsay] goes to the declarant and doesn't go to this

30

defendant."[15] J.A. 350. Moreover, the court ruled, McGee's testimony, like Cosey's, was irrelevant because Defendants were already selling XLR-11 when McGee consulted the chemists. In the court's view, "if the point is to show their state of mind at the time they commenced the criminal conduct, and the criminal conduct commenced before that hearsay statement took place in the first place," "it would be irrelevant." J.A. 351.

b.

We disagree with the district court. As we understand Defendants' argument, they sought to introduce McGee's testimony to show they had an innocent state of mind when shipping XLR-11 on August 9.[16] If McGee timely transmitted to Defendants the chemists' opinions as they claim, his testimony was not irrelevant; rather, it could have been probative of Defendants' mens rea.

According to Defendants, they shipped XLR-11 on August 9 and throughout the alleged conspiracy in part because they relied on the research of chemical experts whose opinions McGee relayed. In Defendants' view, if McGee had consulted chemists who determined XLR-11 *was* substantially similar to JWH-018, told Defendants about those opinions *before* August 9, and Defendants trusted those opinions, "they would not have made their sale to [the retailer in Virginia] on August 8, 2012, or at any time thereafter."

_____

[15] The district court was referring to Ritchie, who proffered McGee's testimony, but the ruling applied to both Defendants.

[16] It is unclear to what extent Defendants still seek to press an advice of counsel defense, but we believe the district court properly barred reliance on that affirmative defense because Defendants could not support it. Consequently, we will examine McGee's testimony not as legal advice, but as general testimony bearing on Defendants' state of mind on August 9.

31

Opening Br. 43. We agree with Defendants that McGee's testimony about the chemists' opinions could be probative of their knowledge of the substantial similarity of XLR-11 and JWH-018 on August 9.

Defendants' argument fails, of course, if McGee consulted chemical experts or reported his findings *after* the August 9 shipment. If Defendants received information from McGee later, his testimony could not provide context for Defendants' state of mind at the time of the alleged crime. But the record is unclear about when McGee consulted the chemists and when or what he informed Defendants that he had learned, so we are unable to conclude on this record that his exclusion from trial was harmless. It is possible that McGee's testimony, if the jury believed it, could have affected the outcome of the case. *Ferguson*, 752 F.3d at 619. If so, the district court abused its discretion in excluding him.

Therefore, we vacate the district court's exclusion of McGee's testimony and remand for further proceedings consistent with this opinion. Defendants must be allowed to develop the evidence on the narrow issue of when McGee consulted chemists about the similarity of XLR-11 and JWH-018 for Defendants' benefit, when McGee informed Defendants about the chemists' research, and what he told them. We note, however, that McGee's testimony, if a factual basis is established, shall be limited to the issue of the chemists' research and no other subject. Further, our holding is consistent with the rules of hearsay in that McGee can only relay the chemists' opinions if they are offered not for their truth, but solely for their effect on Defendants' state of mind. *See* Fed. R. Evid. 801(c) (defining hearsay to include only statements "offer[ed] in evidence to prove the

32

truth of the matter asserted in the statement"). McGee may testify as to facts only. He may testify about his timely conversations with chemists and with Defendants, but he may not speculate as to what Defendants may have been thinking at the time of their alleged criminal acts.

3.

a.

*Ritchie:* Finally, if allowed, Ritchie would have testified that he and Galecki shipped the spice on August 9 with an innocent state of mind because they consulted with attorneys—including McGee—and chemists and "relied on [their advice] in going forward and operated under the assumption that [XLR-11 and JWH-018] were not substantially similar." J.A. 352. The district court excluded Ritchie's testimony as hearsay because others' statements could not reveal Ritchie's state of mind and the testimony did not fit into the state-of-mind hearsay exception. *See* Fed. R. Evid. 803(3). The court saw Defendants' maneuver as another "backdoor" attempt to inject evidence into the trial that did not meet the threshold for one of the unsupported affirmative defenses. J.A. 357.

b.

To the extent Ritchie's testimony about Defendants' state of mind on August 9 is based on his conversations with McGee, it similarly requires sufficient evidence regarding the content and timing of the consultation. As discussed above, if there is insufficient foundation shown on remand to permit McGee's testimony about the chemists he consulted, then Ritchie's testimony on this issue must also be excluded.

Ritchie, of course, can still testify as to his own state of mind without reference to McGee. We therefore vacate the district court's exclusion of Ritchie's testimony on this point and remand for the district court to reexamine Ritchie's testimony in light of any further development of McGee's testimony, as limited above. As in McGee's testimony, any discussion of the chemists' opinions in Ritchie's testimony can only be offered for its effect on Defendants' state of mind and not for its truth. *See* Fed. R. Evid. 801(c).

IV.

As a final matter, Defendants have requested we reassign this case on remand to a different district judge, but they have alleged no express bias by the sitting judge. Reassignment is only warranted in "unusual circumstances," none of which exist here. *United States v. North Carolina*, 180 F.3d 574, 582–83 (4th Cir. 1999) (internal quotation marks omitted). We have examined the record and found no express bias, nor have we seen any indication that the district judge would jeopardize the "fundamental fairness" of any continued proceedings in this case. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016), *vacated and remanded on other grounds by* 137 S. Ct. 1239 (2017) (mem.). Accordingly, we decline to reassign the case on remand.[17]

---

[17] Our rulings in this case expand Defendants' options for presenting evidence in a new trial. Nonetheless, Defendants are under no requirement to present the items of evidence discussed above, nor is the district court required to make any further specific evidentiary decisions save for those consistent with this opinion.

## V.

For the reasons stated above, the district court's decisions are

AFFIRMED IN PART, REVERSED IN PART,
VACATED, AND REMANDED.